FILED

AUG 2 4 2006

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| BETTY LOU GAINES, | § | CASE NUMBER: A06CA673 LY |
| | § | |
| Plaintiff, | § | |
| | § | **JURY TRIAL DEMANDED** |
| v. | § | |
| | § | |
| CAROLE STRAYHORN, DARLA JEAN | § | |
| SHAW, SHERRY LOYD, JAN MARTIN, | § | |
| CHARLENE BATEMAN, DIANA SPISER | § | |
| KAREN EELLS, THOMAS CHAPMOND, | § | |
| VICKIE ANDERSON and RUTHIE | § | |
| FORD, | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT

Plaintiff, Betty Lou Gaines,  brings this action for deprivation of constitutional rights under color of law, 42 U.S.C. §§ 1983, 1985, and 1986 and supplemental state law claims against the Defendants, Carole Strayhorn, Darla Jean Shaw, Sherry Loyd, Jan Martin, Charlene Bateman, Diana Spiser, Karen Eells, Thomas Chapmond, Vicki Anderson and Ruthie Ford and would show as follows:

## PARTIES

1.      Plaintiff Betty Lou Gaines is an individual resident of Bastrop County, Texas.

2.      Defendant Carole Strayhorn is an individual and, acting under the color of state law at all times relevant to this complaint, was the Texas Comptroller of Public Accounts and may be served at Lyndon B. Johnson State Office Building, 111 East 17th Street, Austin, Texas. Defendant Strayhorn is sued in her individual and official capacity.

3.      Defendant Darla Jean Shaw is an individual and, acting under the color of state law at all times relevant to this complaint, was an investigator for Department of Family and Protective Services (DFPS), Residential Child Care Licensing (RCCL) division and may be served at 3635 S.E. Military Drive, San Antonio, Texas. Defendant Shaw is sued in her individual and official capacity.

4.      Defendant Sherry Loyd is an individual and, acting under the color of state law at all times relevant to this complaint, was previously employed as a supervisor for Department of Family and Protective Services, Residential Child Care Licensing (RCCL) division. Ms. Loyd may be served at 131 Burr Road, San Antonio, Texas 78209.  Defendant Loyd is sued in her individual and official capacity.

5.      Defendant Jan Martin is an individual and, acting under the color of state law at all times relevant to this complaint, was Houston District Director of Residential Child Care Licensing (RCCL) for Department of Family and Protective Services and may be served at 2223 Loop South, Houston, Texas 77027. Defendant Martin is sued in her individual and official capacity.

6.      Defendant Charlene Bateman is an individual and, acting under the color of state law at all times relevant to this complaint, was Director of Residential Child Care Licensing (RCCL) for Department of Family and Protective Services and may be served at 701 West 51st Street, Austin, Texas. Defendant Bateman is sued in her individual and official capacity.

7.      Defendant Diana Spiser is an individual and, acting under the color of state law at all times relevant to this complaint, was the Assistant Commissioner for Child Care Licensing for the Department of Family and Protective Services and may be served at 701 West 51st Street, Austin, Texas. Defendant Spiser is sued in her individual and official capacity.

- 2 -

8.      Defendant Karen Eells is an individual and, acting under the color of state law at all times relevant to this complaint, was the Assistant Commissioner and/or Assistant Executive Director for the Department of Family and Protective Services and may be served at 909 W. 45th Street, Austin, Texas 78756.  Defendant Eells is sued in her individual and official capacity.

9.      Defendant Thomas Chapmond is an individual and, acting under the color of state law at all times relevant to this complaint, was the Commissioner and/or Executive Director of the Department of Family and Protective Services and may be served at 1706 Mistywood Drive, Austin, Texas 78746.  Defendant Chapmond is sued in his individual and official capacity.

10.     Defendant Vicki Anderson is an individual and, acting under the color of state law at all times relevant to this complaint, was an employee of the Texas Comptroller of Public Accounts and may be served at Lyndon B. Johnson State Office Building, 111 East 17th Street, Austin, Texas.   Defendant Anderson is sued in her individual and official capacity.

11.     Defendant Ruthie Ford is an individual and, acting under the color of state law at all times relevant to this complaint, was an employee of the Texas Comptroller of Public Accounts and may be served at Lyndon B. Johnson State Office Building, 111 East 17th Street, Austin, Texas.   Defendant Ford is sued in her individual and official capacity.

### JURISDICTION & VENUE

12.     This action arises under the Constitution and laws of the United States and under the Constitution and laws of the State of Texas. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

13.     This action arose from actions and occurrences, which took place primarily in Bastrop County, Texas. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

### A.     Overview

14.     Plaintiff was, at all time relevant to this complaint, a Licensed Child Care Administrator, by virtue of a license issued by the Texas Department of Family and Protective Services ("DFPS") and was employed as the administrator and Executive Director of Woodside Trails Therapeutic Camp located in Bastrop County, Texas.

15.     Woodside Trails was licensed by Defendant Department of Family and Protective Services as a therapeutic camp, a wilderness program treating severely emotionally disturbed boys ages 9-17. Woodside Trails used relationship-based therapy, an evidence-based therapy in which children who may have suffered a developmental failure to form attachments at an early age, are encouraged to form attachments as a therapeutic technique.  Before it closed in 2004, Woodside Trails had cared for over five hundred abused and troubled adolescent boys for over twenty years and enjoyed a favorable success rate in treating these youths, many of whom had failed at as many as twenty or more previous placements.

### B.     Allegations of Child Sexual Abuse

16.     An  allegation of sexual abuse of a camp resident by a former employee of Woodside Trails, Jackie Dewayne Reynolds, was reported to DFPS on July 9, 2004.

17.     Joseph D., the alleged victim of sexual abuse was officially interviewed by Defendant Darla Jean Shaw on July 13, 2004.

18.     On August 16, 2004, two weeks before DFPS concluded its investigation, Joseph D. recanted the allegation in front of Defendant Shaw and the Bastrop County Sheriff's Deputy, Steve Suriano. This recantation was recorded on audio tape.

19.     Despite the recantation, Mr. Reynolds was indicted on charges of sexual abuse. The charges against Mr. Reynolds have since been dismissed by Bastrop County District Attorney's Office.

20.     As a treatment center for severely emotionally disturbed boys where false allegations are often made, a professional and impartial investigation into such allegations is therefore necessary.   At Woodside Trails, most such allegations, before 2004 were ruled out after being thoroughly investigated by qualified unbiased investigators and arrest warrants were never issued prior to completion of the investigation. No such allegations resulted in any adverse action against Plaintiff or Woodside Trails. However, Defendant Strayhorn asserted publicly that the fact that repeated charges against Woodside Trails had been ruled out was evidence of incompetence at DFPS.

21.     Plaintiff encouraged children residing at Woodside Trails to voluntarily engage in religious and spiritual practices, based on each child's decision as to what religious activity fulfilled his spiritual needs.

22.     Some of the boys residing at Woodside Trails were selected to attend religious ceremonies of the Lakota, American Plains Indians, based on each child's willingness to study the religious teachings, the child's behavior and their religious and cultural heritage, as some children were part American Indian.

23.     In June 2004, five children attended the Sun Dance ceremony and voluntarily participated in certain religious rituals.

24.     In November 2004, a DFPS licensing investigator investigated a complaint of abuse or neglect to children who participated in the Sun Dance Ceremony, and was unable to determine that abuse or neglect had occurred or that noncompliance with any agency regulation had occurred as a result of the children's participation.

25.     Although the Sun Dance investigator and her immediate supervisor agreed with the "unable to determine" resolution of that investigation, Defendant Bateman with the knowledge and/or approval of Defendants Spiser, Eells and/or Chapmond changed the finding to "Reason to Believe," that Plaintiff was neglectful by allowing children to participate in the Sun Dance religious ceremony although no additional investigation or information was obtained by Defendant Bateman to support her action.

26.     On information and belief, Defendants Bateman, Spiser, Loyd, Shaw, Eells and/or Chapmond believed that the only way to relieve the political pressure from Defendant Strayhorn was to find reason to believe in connection with the charges brought against Woodside Trails' employees during the period after the issuance of Defendant Strayhorn's unauthorized report on Texas foster care in April 2004.

27.     On information and belief, Defendants Chapmond, Eells, Spiser and/or Bateman removed the experienced investigators who knew Woodside Trails and its therapeutic approach and replaced them with ignorant and more pliable investigators.

28.     Had a proper investigation been conducted, free from politics and bureaucracy, the allegation of sexual abuse and the allegations of neglect against Plaintiff would have been ruled out by a vast preponderance of the evidence.

29.     Following an administrative hearing before the State Office of Administrative Hearings, on or about July 13, 2006, two impartial administrative law judges unanimously found that DFPS had no evidence of sexual abuse of Joseph D. by Mr. Reynolds

and ordered that his name be removed from the DFPS registry of known perpetrators of child abuse.

30.     The administrative law judges also unanimously found that DFPS had no evidence of neglect of Joseph D. by Mr. Reynolds or the Plaintiff Betty Lou Gaines and further that the agency had no evidence of gross neglect by Plaintiff that would be necessary to justify revocation of her child care administrator's license.  The decision and order finding no factual basis to support DFPS' proposed revocation of Plaintiff's license was issued on or about July 20 2006.

31.     The administrative law judges unanimously found that the participation of some children in the Sun Dance religious ceremony was not harmful or likely to be harmful to them and that Woodside properly disclosed to parents or guardians what the Sun Dance Ceremony was about and the rituals the children might participate in.  They found no evidence of neglect by Plaintiff in allowing children to participate in such religious ceremonies as stated in their July 20, 2006 decision.

C.     **The Strayhorn Report**

32.     The allegations against Plaintiff and other Woodside Trails employees followed the release of a report by Defendant Strayhorn's Office of the Texas Comptroller of Public Accounts entitled, "Forgotten Children."

33.     As the Comptroller of Public Accounts, Defendant Strayhorn did not have the legal authority to initiate and conduct an investigation into the effectiveness and efficiency of DFPS's policy, management, fiscal affairs or operations, except in response to a request from the Governor of Texas, which had not been made with regard to DFPS.

34.     In so far as it discussed Woodside Trails, Defendant Strayhorn's report was materially misleading and inaccurate.

35.     In the report, Defendant Strayhorn makes reckless and exaggerated claims about the living conditions at Woodside Trails and sharply criticizes DFPS for placing children there.   For example, Strayhorn's  report alleges that outhouses at Woodside Trails "discharge sewage on the ground," despite the fact that the outhouses in the camps met the requirements set by the Texas Department of Health and were physically incapable of discharging sewage on the ground.    The basis for that incendiary false statement was a letter issued at Strayhorn's insistence, then withdrawn, by the Bastrop County health inspector.

36.     Defendants Strayhorn, Anderson and/or Ford knew the inflammatory statement had been withdrawn before publishing this defamatory information in Strayhorn's report.

37.     Strayhorn's report also made false claims of abuse and neglect by the staff of Woodside Trails.

38.     On information and belief, in her visit to Woodside Trails, Defendant Strayhorn spent less than 30 minutes talking to only three of the fifty-plus residents of the Camp and their associated group home, Fortune House.

39.     Nothing in her "Forgotten Children" report indicates that Defendant Strayhorn is aware of the nature and extent of the serious emotional disturbances that many of the children at the facility had, which complicated their placements and treatment.

40.     At Woodside Trails, where they took the most difficult cases, each child arrived with an average of over 2.5 diagnoses of serious emotional disturbances.

41.     All of the children who came to Woodside Trails were children that had a long history of abuse, neglect, and trauma that is hard to imagine if one is not familiar with the children they served.

42.     Children were not placed at Woodside Trails because they were victims. They were there because they had hurt someone or something: sexually hurt someone, were violent and hurt someone, or broke into someone's home or business and hurt someone.

43.     All of the children at Woodside Trails had become perpetrators or they would not have been at Woodside Trails.

44.     DFPS' finding against Plaintiff and other Woodside employees, the findings against the camp, and the subsequent indictments and malicious prosecutions were the direct result and consequence of the reckless and wanton, abusive and unauthorized acts of Defendants Strayhorn, Ford and Anderson used the Office of the Texas State Comptroller of Public Accounts to pursue Strayhorn's personal political objectives as a gubernatorial candidate.

**D.     Defendant Strayhorn's Campaign against Woodside Trails and its Employees**

45.     In April 2004, News 8 Austin sent a reporter, Eric Allen, to spend the night and investigate the claims made in Defendant Strayhorn's report.

46.     The news report was favorable to Woodside Trails—the boys reported that they liked living at the camp and that it was good for them.

47.     On information and belief, according to members of Defendant Strayhorn's staff, Defendant Strayhorn's animosity against Woodside Trails was motivated, in part, by this news report contradicting the results of her unauthorized investigation.

48.     On information and belief, when News 8 Austin broadcast their report, Defendant Strayhorn was furious and vowed her office would shut Woodside Trails down.

49.     Defendants Strayhorn, Ford and Anderson engaged in the following malicious actions, both before and after the News 8 Austin broadcast:

a.     Defendants reported over 40 separate allegations to the abuse hotline, most, if not all of which were not only false but implausible. Almost all of these

allegations were of the nature, "at an unknown time, an unknown counselor, required an unknown camper or campers to be deprived of sleep as a method of discipline." Despite the vague, absurd nature of these allegations reported to the Texas Child Abuse and Neglect Hotline by her office, every one of them was necessarily investigated, agitating the already disturbed children in the camp and diverting valuable agency resources and personnel from investigation of legitimate cases of child abuse.

                        b.       After filing numerous reports alleging abuse and neglect of the children at Woodside Trails, Defendants Strayhorn, Ford and/or Anderson demanded that DFPS explain its decisions ruling out alleged violations. Defendants Chapmond, Eells, Bateman and Spiser eventually wilted under this assault, first by replacing the experienced hotline investigators with entirely new personnel—who, in their own words, were unfamiliar with the camp, its therapeutic techniques and the nature of the children treated—and ultimately by trumping up grounds to revoke the camp's license.

                        c.       On May 12, a "follow up inspection" of Woodside Trails by Defendant Strayhorn and her staff included the introduction of a News4 WOAI-TV San Antonio reporter, Tanji Patton, and her producer into the camp posing as members of the Defendant Strayhorn's own "inspection" team. Using a hidden camera, the reporter secretly filmed the camp and the campers, a gross violation of the rights of the children, the staff, and the facility.

                        d.       News4 WOAI-TV flew a helicopter at tree top height over the camp filming the children. They also filmed aerial footage of the Plaintiff's home.

                        e.       Defendants Strayhorn, Ford and/or Anderson obtained a roster of Woodside Trails personnel and attempted to contact its employees. On information and belief, when Defendant Strayhorn's staff reached an employee that no longer worked at the facility and the former employee said good things about Woodside Trails, they would end the call

peremptorily—they were apparently only interested in former employees who had hard feelings. They eventually found Rick Allen, a former employee who quit shortly before being dismissed by Woodside Trails for good cause. He became a tool of Defendant Strayhorn's assault against Woodside Trails, as he was the source of many additional false allegations of abuse with the Texas Child Abuse and Neglect Hotline.

        f.      Defendants Strayhorn, Ford and Anderson and/or members of Stryahor's staff made false reports to OSHA alleging possible violations of workplace safety.

        g.      On information and belief, behind the back of the Bastrop County Commissioners, Defendant Strayhorn and her staff induced the Bastrop County Health and Sanitation Department (BCHSD) to inspect Woodside Trails' camp sites. In  20 years of inspections by the DFPS and is predecessor agencies, the state regulators had always found Woodside Traisl to be in compliance with the law. Nonetheless, the BCHSD wrote a letter criticizing Woodside Trails. That letter was superceded by a later letter, retracting the most inflammatory remarks of the first letter. In her report, however, Defendant Strayhorn quoted from only the first letter, ignoring the fact that the quoted statements had been retracted and were no longer sponsored by BCHSD.

        h.      On information and belief, Defendant Strayhorn, Ford and Anderson or their agents unlawfully sought out local pharmacists in Smithville and Bastrop seeking evidence of drugs prescribed for, taken by, or given to the children or the counselors.

        i.      On information and belief, Defendants Strayhorn, Ford and Anderson  or their agents unlawfully contacted local neighbors seeking (and pushing) negative information about Plaintiff and Woodside Trails.

        j.      On information and belief, Defendants Strayhorn, Ford and Anderson or their agents  unlawfully contacted the Smithville, Bastrop, and Bastrop County law

enforcement departments seeking any derogatory information they could use against Plaintiff and Woodside Trails.

50.     The extreme, personal, and invasive character of Defendant Strayhorn's inquiry is demonstrated by the fact that her file included a copy of Plaintiff's marriage license and the expunged juvenile record of her husband.

51.     Defendants Strayhorn, Ford and Anderson knowingly and intentionally distorted the facts about Woodside Trails and Plaintiff for Strayhorn's political advantage.

52.     In April 2004, Defendant Strayhorn publicly vowed to see that the Camp was closed and the license revoked.

53.     Suddenly in August of 2004, following Defendants Strayhorn, Ford and Anderson's contacts with local law enforcement, there were multiple pending criminal investigations—all but one were of people never before accused of improper behavior, most regarding allegations of sexual improprieties and some involving acts that allegedly occurred years before.

E.     **The Closing of Woodside Trails**

54.     On August 5, 2004, Plaintiff Betty Lou Gaines testified on the subject of therapeutic camping before a Texas legislative committee.

55.     Also testifying that day were members of the staff of the Office of the Texas Comptroller of Public Accounts as well as representatives of DFPS.

56.     Ms. Gaines's testimony regarding the need for therapeutic camping as well as the nature and extent of the attack against Woodside Trails by Defendant Strayhorn's office was extremely well received by the Committee, and especially its chair, Representative Suzanna Hupp.

57.     On August 13, 2004, with less than one hour's notice, at the direction of Defendants Chapmond, Eells, Spiser and Bateman, DFPS abruptly removed over 22 children against their wishes from Woodside Trails.

58.     This removal was without proper planning by Defendants Chapmond, Eells, Spiser and Bateman, and with no attempt to consult with parents, families, executives at the facility or even the children's own caseworkers.

59.     With clear evidence of Defendants Chapmond, Eells, Spiser and Bateman's willingness to sacrifice the children to appease Defendant Strayhorn, on August 30, 2004, the board of directors of Woodside Trails reluctantly decided to discontinue the operation of their therapeutic group foster home, Fortune House, because they feared that Defendants Chapmond, Eells, Spiser and Bateman, under political pressure from Defendant Strayhorn, would act precipitately as before, with great harm to the remaining boys.

60.     The closing of Woodside Trails was the culmination of the extensive and relentless political pressure exerted against the agency and the facility by Defendant Strayhorn.

**F.     The Case Against Jackie Dewayne Reynolds**

61.     In over 22 years of operation, only one confirmed case of sexual assault of a child by an employee at Woodside Trails had been found and it was reported by Woodside Trails.  The Woodside Trails employee involved in the incident was not arrested until AFTER the allegation was investigated.

62.     No Woodside Trails employee was ever arrested based solely on an allegation of sexual abuse until July 22, 2004, when Jackie Dewayne Reynolds, a former employee was arrested on charges of sexual assault  that had been made and then retracted by a former camp resident, identified as "Joseph D."

63.    Mr. Reynolds was never notified by TDFPS that an allegation had been made against him as required by the Family Code (Subtitle E, Chapter 261, Subchapter D, paragraph 261.307), until AFTER he was arrested.

64.    Joseph D. made the allegation against Mr. Reynolds less than a month after transferring from Woodside Trails to "Pegasus" a specialized juvenile sex-offender treatment program located in Lockhart, Texas.

65.    On information and belief, a member of Pegasus' Board of Directors and its Executive Director is an acquaintance and political ally of Defendant Strayhorn's.

66.    In her "Forgotten Children" report Defendant Strayhorn cited Pegasus as an example of a good, clean, safe facility for the state's foster children.

67.    The specific allegation made against Mr. Reynolds was that he forced Joseph D. to perform oral sex on him and that Mr. Reynolds performed oral sex on Joseph.

68.    According to the Licensing Investigation Report issued by Defendants Shaw, Loyd and/or Bateman, Joseph D. asserted the abuse occurred repeatedly during Mr. Reynolds' last few weeks of employment at Woodside Trails in April 2004.

69.    According to the Licensing Investigation Report, Joseph specifically stated nothing happened outside of camp and that the abuse occurred only at his bedside or at the fire pit.

70.    The shelters the boys lived in were raised platforms with permanent tarp roofs and no walls, so that almost all of the campsite area was visible to other campers and staff, and the campsite was illuminated twenty-four hours a day.

71.    Eleven other children and one other counselor were usually present at the campsite  during the time Joseph D. originally alleged the abuse occurred, all of whom were within both eye and earshot of his bed and the camp fire pit.

72.    No witnesses corroborated Joseph D's story of abuse.

73.    Defendants Shaw, Loyd and Bateman chose to ignore the fact that it would have been virtually impossible for the abuse to have occurred in the context described by Joseph D. in without a corroborating witness.

74.    Defendants Shaw, Loyd and Bateman completely disregarded documented evidence of retaliatory threats made by Joseph D. against Mr. Reynolds in the months preceding Joseph D's. allegation of sexual abuse by Mr. Reynolds.

75.    Nonetheless, Defendants Shaw, Loyd and Bateman concluded that Mr. Reynolds was guilty based on  a biased and radically insufficient investigation, and issued a "Reason to Believe" finding, meaning that the DFPS investigator concluded based on a preponderance of the evidence that  that Mr. Reynolds sexually assaulted Joseph D. at Woodside Trails.

76.    Defendant Shaw, with the approval of Defendants Loyd, Bateman, Eells, Spiser and/or Chapmond, issued a similar finding against the other counselor and also concluded that Plaintiff Betty Lou Gaines, the Executive Director, was guilty of "neglectful supervision."

77.    Prior to finding Plaintiff responsible for neglectful supervision, Defendants Shaw, Chapmond, Bateman, Eells, Spiser, or Loyd never advised Plaintiff that she was the subject of investigation, in violation of DFPS rules.

78.    The grand jury indictments AND all of the RTB findings—were issued on the exact same date: Wednesday, August 25, 2004.

79.    According to Defendant Shaw's  Licensing Investigation Report, DFPS' investigation of the allegation against Plaintiff and Mr. Reynolds didn't even conclude until August 31, 2004, six days AFTER issuing the finding of Reason to Believe.

80.   All adverse action against plaintiff was improperly motivated by political pressure from Defendants Strayhorn, Anderson and/or Ford to close Woodside Trails.

### G.   Fighting the System

81.   Plaintiff requested an Administrative Review, an informal review process conducted by a DFPS representative not directly associated with the investigation or the ruling.

82.   In violation of the Family Code (Subtitle E, Chapter 261, Subchapter D, paragraph 261.309), which in part states that "if a person under investigation for allegedly abusing . . . a child . . . files a complaint relating to the conduct of the department's staff or to department policy, the department shall conduct an informal review to . . . resolve the complaint" Defendants wholly failed to respond to such a complaint by Mr. Reynolds.

83.   Defendant Martin refused Mr. Reynolds' request to postpone the administrative review, despite the fact that the Family Code (Subtitle E, Chapter 261, Subchapter D, paragraph 261.309, subparagraph (d)) states in part that "if a civil or criminal court proceeding or an ongoing criminal investigation is pending, the department may postpone the review until the court proceeding is completed."

84.   The code also states that "unless a civil or criminal court proceeding or an ongoing criminal investigation relating to the alleged abuse . . . is pending, the department employee shall conduct the [administrative] review . . . not later than the 45th day after the date the department receives the request."

85.   Plaintiff's request for a review was received by DFPS on September 7, 2004 and formally acknowledged ten days late. An administrative review was not scheduled until approximately December 1, 2004, a full ninety days after they received the request.

86.   The Administrative Review was conducted by Defendant Martin, after ex parte discussion of the case with Defendant Bateman via both phone and email.

- 16 -

87.     Defendant Martin's report, upholding the original finding, doesn't even mention Joseph's recantation on August 16, 2004 nor does it mention his threats to make a false allegation against Joseph D.

**H.     Investigating Allegations of Child Sexual Abuse**

88.     The primary goal of any investigation into a claim of child sexual abuse should be to first determine whether the crime actually occurred.

89.     In the case against Mr. Reynolds, the ONLY evidence that the crime of abuse occurred is the alleged victim's initial outcry, which he later retracted.

90.     Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond failed and refused to consider the following facts established prior to the investigation of alleged sexual assault by Mr. Reynolds:

a.     Joseph was exposed to violence at an early age.

b.     He was exposed to sex and sexuality at an early age.

c.     He has difficulty in sustaining relationships of any substance.

d.     There is a "come here, go away" pattern he has of relating to people.

e.     He has an expert ability to "split" the adults and play them off against one another.

f.     He was the subject of a powerful and rare treatment intervention at camp called "permission to lie," used with a boy who lies so frequently that little he says can be believed. In permission to lie, the consequences of being known as a liar are felt by the camper when nothing he says is accepted as true by the counselors or other children without corroboration.

g.      He has an extensive history of sexually acting out dating back to before his placement at Woodside Trails.

h.      Joseph D. Threatened to make false allegations against Mr. Reynolds twice before..

91.      Joseph D.'s allegation included many implausible contentions  and was inherently not credible.  The following  information was available to the investigators, but was wholly disregarded:

a.      The fire pit and Joseph D.'s bed where he claimed the abuse occurred were both within feet of several other beds at camp where kids were lying and the entire camp site was lit all night long.

b.      The camp, indeed all of Woodside Trails, is surrounded by a dense, wooded forest and it was dark when Joseph alleges the abuse occurred. A dark, densely wooded forest is a much more likely venue for such illicit sexual behavior as it is likely more secluded and less visible, yet the alleged victim states specifically that abuse ONLY occurred at his bedside and at the fire pit, both in the middle of a lit camp surrounded by eleven other children and, at times, other counselors and/or employees of the facility, none of whom corroborated the alleged victim's admittedly false allegation of child sexual abuse.

c.      The outcry was preceded by Joseph's threat to make a false allegation against Mr. Reynolds, for which Joseph apologized in a log note, saying, "I'm really sorry for . . . threatening to . . . make a false allegation on you".

d.      In May, following Mr. Reynolds's departure from Woodside, Joseph denied that he had ever tried to touch him in a sexual way.

e.      There is no statement or evidence provided by any member of Joseph's family corroborating sexual abuse by Mr. Reynolds.

f.     There is no statement or evidence provided by any of the alleged victim's fellow campers corroborating sexual abuse by Mr. Reynolds.

g.     There is no statement or evidence provided by any Woodside Trails personnel corroborating sexual abuse by Mr. Reynolds.

h.     There is no medical evidence substantiating the occurrence of sexual abuse.

i.     There is no physical evidence substantiating the occurrence of abuse.

j.     The outcry was promptly and spontaneously retracted barely a month after it was made.

92.    In this case, an investigation of Mr. Reynolds' past as well as his documented relationship with Joseph would have revealed the following (all of this information was available to the investigators, but they did not request these materials until after the finding of abuse was made):

a.     There is no prior history of sexual abuse by Mr. Reynolds in any context.

b.     Mr. Reynolds made no plea bargain or confession.

c.     Mr. Reynolds consistently denied the allegations.

d.     Mr. Reynolds continually requested coaching and guidance from supervisors and peers regarding sexually provocative conduct by Joeph D.

e.     Mr. Reynolds' work with Joseph was consistently monitored and reviewed by supervisors, the consulting psychologist and consulting psychiatrists, and by the therapist—all of whom with their combined 100+ years of experience in this field believed it

consistent with the practice of relationship-based therapy used by Woodside Trails and NOT "sexual grooming of a child" as DFPS continues to try to claim.

93. After considering these three elements— Joseph's character and treatment history, the specifics of his allegations against Reynolds, and the nature of their relationship—it is with blatant and reckless disregard for the facts that anyone would conclude by a preponderance of the evidence that abuse occurred in this case.

94. Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond were obligated to weigh the evidence in order to determine whether an act of sexual abuse actually occurred.

95. Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond failed to meet this obligation and in so doing willingly and maliciously labeled an innocent man a child predator.

96. Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond ignored ALL of the evidence—which they were legally, morally, and ethically obligated to consider—that casts substantial doubt on the alleged victim's story.

97. Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond used this allegation as an opportunity to discredit Woodside Trails and the Plaintiff Betty Lou Gaines, so they could justify closing the facility, thus relieving the political, legislative, and public pressure brought to bear on their office at least in part by the report issued by the Office of the Texas State Comptroller of Public Accounts and Defendant Strayhorn.

98. Defendant Shaw concluded that recantations are "not uncommon for children who had been sexually abused." This is by far one of the most startling revelations in the report.

99.     For any investigator of abuse allegations to contend that recantations are common is reckless and irresponsible. Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond cannot claim to know with any degree of certainty which statement, the outcry or the recantation, was the lie.

100.    As further evidence of Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond bias in this investigation, conversations with Joseph and log notes are misused in the report and taken out of context. The most egregious example of this was a December 2003 log note cited by Defendant Shaw in the report.

101.    According to the Licensing Investigation Report, "In Dec. 03, Mr. Reynolds told Joseph that he loved him after the two talked about a 'sex dream' Joseph had involving him and Mr. Reynolds" but review of the documentation does not support this determination.

102.    Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond willfully misconstrued other log notes as more evidence that Mr. Reynolds was grooming Joseph for sex.

103.    Had a thorough investigation been conducted—as was Defendant Shaw's moral, ethical, and legal obligation— Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond would have learned that such expressions of love are entirely consistent with the practice of relationship-based therapy and not at all unique to my relationship with the alleged victim.

104.    Everyone with access to log notes, with the exception of the boy's family, were well trained to identify the signs of sexual grooming, and none found these log notes as evidence of sexual grooming at the time they were written.

105.    Plaintiff Betty Lou Gaines, Executive Director of Woodside Trails, was cited by DFPS for neglectful supervision of Mr. Reynolds.

106.    Joseph's threats to make a false allegation was incredibly NOT considered at all by Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond notwithstanding requests that they do so.

107.    A review of the log notes about this incident and his subsequent letter to me is quite revealing. This log note is dated February 4, 2004:

> "After Joseph D was kicked out of school. I spent some time talking to him about what was bothering him while his treatment team met for a TPR. We were sitting out in front of the office and I had taken his shoes because he was threatening to run off. He was telling me how angry he was at me for giving up on him. I assured him that I never gave up on him and that I would always be there for him. He said he knew exactly how to get me to give up on him.

> "I asked him if he was talking about the thing he said he would never do to me and he just sat there stoic. I took it as a silent acknowledgment. The thing he said he would never do to me was to *accuse me of doing something sexually inappropriate to him or with him* (emphasis mine). It was about a month and a half ago, shortly after Alex B accused a long-standing patriot of [Woodside Trails] of doing something sexually inappropriate with him. He said he just wanted me to know that he would never do that to me."

108.    As part of his consequence for making this threat against Mr. Reynolds, Joseph wrote an apology letter, dated February 11, 2004, published in the log notes:

> "Dear Jack, I sincerely apologize to you, best incamp, I am really serious. I'm really sorry for making a big problem Wednesday and threatening to run away and making you put your hands on me by holding me to the ground. When I said *I will make a false allegation on you* (emphasis mine), I was meaning in a way you can leave me alone at the time so I could run away and I was trying to run away from my problems so I would not have to talk or tell what was going on right then. The problem was that I could not go on outing with you or with the camp. I couldn't make any phone calls and hanging out with you and having to tell with people lying on me flirting with other kids. And I was mad at you because you wouldn't let me run away and you would not be my incamp for a while and I thought that meant that you wouldn't be my incamp at all you wouldn't spend time with me. It all started when you went to Shady Oaks and I was afraid you wouldn't work with me like we were. I'm really sorry Jack R seriously good luck incamp.

> "Love, your incamp Joe"

109.   The report also fails to mention the unlikely similarities between the allegation Joseph made against Mr. Reynolds and the allegation he made against a gay babysitter several years ago. A log note written by me dated March 03, 2004 reads:

> Joseph D and I hung out for a couple of hours before his family session to work on his letter to Jeramy, the babysitter who molested him. . . . He said he was alone with Jeramy when *he called Joseph to the bedroom* and *told him* to perform oral sex. At first *Joseph refused*, but Jeramy insisted and . . . *forced his head down*.

110.   In Defendant Shaw's Licensing Investigation Report, under "Victim's Explanation," it reads:

> Joseph stated *Mr. Reynolds took him to the fire pit area* and *asked him* to put his mouth on Mr. Reynolds' penis. Joseph said no. Joseph stated Mr. Reynolds *forced him* to put his mouth on Mr. Reynolds' penis by . . . *forcing his head to Mr. Reynolds' penis*.

111.   The similarities (emphasized by italics) are striking and beyond coincidental. Even some of the language and circumstances are identical (emphasized by underscore).

112.   It is worth noting that despite the fact that all the kids claimed to have seen Mr. Reynolds talking to Joseph, not a single one of them substantiated the claim of abuse.

113.   It is apparent from the report that the Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond did not review the audio tape or a transcript of Mr. Reynolds's interview on August 20, 2004 before concluding that sexual abuse had occurred and that Plaintiff was neglectful.

114.   This is circumstantial evidence of a deliberate attempt on the part of the Defendants Shaw, Loyd, and Bateman to manipulate the facts to substantiate findings of abuse and neglect.

115.   This fact is confirmed by discrepancies between several tape recorded interviews and inaccurate descriptions of statements recited in the report.

a.   Mr. Reynolds did not DENY taking Joseph off campus alone

b.      Mr. Reynolds did not say, "Ms. Gamble's son stated" he saw me "lying on Joseph's bed."

c.      Mr. Reynolds did not "call Ms. Gaines in May to tell her" I couldn't find a job. The conversation took place at Woodside Trails in person, not over the phone.

d.      Mr. Reynolds did not say that he spent all of his"days and time off at the facility, especially with Joseph" because he lived alone and only had a dog for company.

e.      Mr. Reynolds never told the interviewers that, "Joseph was worth everything." He said that Joseph was worth taking risks for as he believed all kids are.

116.    Other areas of concern within the report include:

a.      There is no discussion at all of Joseph's problems in relationship-building, critical to the successful treatment of his issues (except for the remark by his caseworker).

b.      Joseph's well-documented and extensive history of lying and sexually acting out is hardly addressed in the report, if at all.

c.      There is no mention whatsoever in the report of Joseph 's involvement in the "Permission to Lie" program at Woodside Trails.

d.      There is no reference to the fact that both locations where Joseph claimed the assault occurred are within feet of several other children in an area well lit at night.

e.      There was seemingly no effort made to test the credibility of the alleged victim or his abuse allegation.

f.      The investigators seem to be unaware of Joseph 's threats to make a false allegation or to have Mr. Reynolds fired, despite the fact that it was logged as a CRITICAL INCIDENT and available to them.

117.   Despite a small army of "investigators," the report reflects a total lack of evidence corroborating the allegation.

118.   It is entirely unreasonable to conclude that abuse occurred, and that conclusion is absolutely not compelled by a preponderance of the evidence, which by law is DFPS' standard.

119.   The report and its finding were politically mandated.

**I.      The Recantation**

120.   As previously stated, a month after his initial allegation, on August 16, 2004, Joseph was interviewed by Detective Suriano  and Defendant Shaw who on behalf of DFPS ruled there was "reason to believe" the allegation.

121.   No copy of the audio- taped recantation exists, and no transcript was ever made.

122.   The charges were dropped barely a month after Mr. Reynolds listened to the tape and informed his court-appointed attorney of the tape's contents.

a.      In the interview the child repeatedly, and under a great deal of pressure from two adults trained to interrogate witnesses and/or child sexual abuse victims, persistently and convincingly denies any sexual abuse.

b.      In response to16 different inquiries, Joseph D. consistentlydenied that Mr. Reynolds sexually abused him.

123.   Despite his repeated denials of sexual abuse, Defendant Shaw falsely stated in the Licensing Investigation Report with regards to this interview, that Joseph merely, "started to infer that Mr. Reynolds had not abused him."

124.   This gross misrepresentation of that interview is prima facie evidence of Defendant Shaw's efforts to conceal the truth about that interview.

125.    That interview took place nine days before DFPS ruled RTB in their allegation against Mr. Reynolds; nine days before the grand jury indicted him.

126.    Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond conspired to conceal and/or misrepresent the truth of that interview.

127.    On information and belief, the reason so many people were eager to accept this inherently unbelievable allegation of sexual abuse and other similar allegations against other employees was to justify closing the facility, thus courting political favor from Defendant Strayhorn and to avert further media and legislative scrutiny of DFPS. Consequently, DFPS found Plaintiff responsible for neglectful supervision of Mr. Reynolds.

128.    On information and belief, the allegations of sexual abuse against employees of Woodside Trails and subsequent finding of neglectful supervision against Ms. Gaines formed the basis for removing the children and proposing revocation of Woodside Trails' license.

129.    On August 25, 2004, Defendant Shaw informed Plaintiff's employer, Woodside Trails that she was "immediately" not to have any contact with children thereby depriving her of the use of her child administrator's license, without good cause and in violation of her due process rights based on the unfounded allegations of sexual abuse by Mr. Reynolds and related alleged negligence of Plaintiff.

130.    Defendants Strayhorn, Ford, Anderson, Chapmond, Shaw, Spiser, Bateman, Loyd and Eels set in motion events that would foreseeably cause the deprivation of Plaintiff's constitutional rights and gross harm to her financially and professionally. The conduct of these Defendants was not objectively reasonable and was arbitrary, capricious and unrelated to the legitimate state goal of protecting foster children, but instead was intended to either promote

the political goals of Defendant Strayhorn or to avoid Defendant Strayhorn's relentless attacks on DFPS and Defendant Chapmond.

**J.      Policy and Practice Allegations**

131.    On information and belief, Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond  developed and maintained unconstitutional policies and customs exhibiting willful disregard for the constitutional and other rights of those being investigated for child sexual abuse and/or neglect, including but not limited to the following policies or customs, which proximately caused damages to the Plaintiff:

a.      inadequately training its investigators and supervisors including Defendants herein;

b.      failing to allege, with the specificity required by law, facts that form the basis of their investigation findings;

c.      the presumption of guilt and the necessity of those accused of child sexual abuse to prove their innocence;

d.      ignoring policies, procedures and customs that do not suit their agenda;

e.      relying on a faulty and heavily disputed finding of sexual abuse to continue a pattern of invasive and discriminatory harassment, without due process,

f.      seeking retribution against those who lawfully question and/or oppose the illegitimate actions of DFPS;

g.      acting with intentional and/or reckless disregard of the Constitutional and statutory rights of individuals, including the Plaintiff herein and those similarly situated;

h.     arbitrarily discriminating against the Constitutional and statutory rights of individuals, including the Plaintiff herein and those similarly situated with either or both intent to discriminate or through improper execution of its duties; and

i.     inadequately and improperly investigating allegations of child abuse or neglect, as follows:

i.     they believe the lack of corroborating evidence in support of an allegation of child sexual abuse is the norm and therefore not indicative of a false allegation regardless of the context in which the abuse is alleged to have occurred;

ii.     they believe a retraction of an allegation of sexual abuse by the same child that made the outcry is evidence of the alleged perpetrator's guilt rather than evidence the child made a false allegation;

iii.     they believe child sexual abuse victims almost always recant their allegation(s), an assertion completely NOT supported by the literature.

iv.     they view the alleged victim's expressions of guilt and remorse over the trouble his/her false allegation has caused OR is causing as evidence of the alleged perpetrator's guilt rather than as evidence of a legitimate expression of remorse by the child with regard to making the false allegation;

v.     they believe Child Sexual Abuse Accommodation Syndrome (CSAAS) is a legitimate tool for diagnosing the occurrence of child sexual abuse despite its widespread repudiation, specifically in America's court systems; and

vi.     they view the denial of the allegation by the alleged perpetrator as evidence of his/her guilt.

132.     On information and belief, beginning in the Spring of 2004, as a direct result and consequence of the reckless and wanton abuse of power and authority by Defendant

Strayhorn, it became the policy, practice or custom of Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond  to presume guilty any Woodside Trails employee accused of any wrong doing.

**COUNT I:**        **VIOLATIONS OF 42 U.S.C. § 1983**

133.   Plaintiff incorporates by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

134.   Defendants   conduct   violates   clearly   established   statutory   and/or constitutional rights of which a reasonable person would have known.

135.   On information and belief, Defendants' conduct was vindictive; they intentionally treated Plaintiff differently without rational basis both as an individual and as distinguished from those similarly situated.

136.   On information and belief, Defendants' conduct was motivated by ill-will and was undertaken on behalf of and as a direct result and consequence of the reckless and wanton abuse of power and authority by Defendant Strayhorn with the intent to deprive Plaintiff of her civil rights or with reckless disregard of those rights.

137.   Defendants' conduct was not objectively reasonable and set in motion events that would foreseeably  result in gross harm to Plaintiff.

138.   Defendants' conduct violates common sense of decency and fairness.

139.   As a result of the above described acts, Plaintiff was deprived of due process protected by the substantive component of the due process clause,  liberty without due process of law, and equal protection of the laws in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

**COUNT II:**        **VIOLATION OF 42 U.S.C. § 1983**

**A.**        **RTB RULING**

140.    Plaintiff incorporates by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

141.    Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond acted under color of state law when upon investigation of alleged sexual abuse of a child at Woodside Trails they conclude on August 25, 2004 there was "reason to believe" (RTB) that the Plaintiff was guilty of neglect.

142.    Defendants Shaw and Loyd had a duty to fairly evaluate all the evidence, including exculpatory evidence as well as any circumstantial evidence, regardless of whether it indicates guilt or innocence, without bias or prejudice before making a finding of "reason to believe" (alleged perpetrator is likely guilty), "unable to determine" (don't know whether the alleged perpetrator is likely guilty or not), or "ruled out" (alleged perpetrator is likely not guilty).

143.    Defendants Shaw and Loyd failed in this duty, as follows:

a.    failed to give proper consideration to the alleged victim's family history, DFPS record, and his three-year treatment history at Woodside Trails;

b.    gave virtually no consideration to the alleged victim's involvement with the "Permission to Lie" program at Woodside Trails, a program he participated in because of his habitual lying behavior;

c.    failed to give proper consideration to the difficulty the alleged victim has in sustaining relationships of any substance, the "come here, go away" pattern he has of relating to people, and his expert ability to "split" the adults and play them off against one another;

d.      failed to give proper consideration of the alleged victim's two prior threats to make a false allegation against Mr. Reynolds;

e.      failed to give proper consideration to the alleged victim's own DFPS caseworker, Teresa Moran, who told her the alleged victim is "a sexual predator . . . [with a] history of lying . . . [who] has a hard time separating friendship from [sexual] grooming;"

f.      failed to give proper consideration to the alleged victim's initial denial of any sexual abuse at Woodside Trails;

g.      failed to give proper consideration to the inherent lack of believability of the alleged victim's allegation, as follows:

i.      the fire pit and bed where the alleged victim claimed the abuse occurred were both within feet of several other beds at camp where kids were lying;

ii.      the entire camp site was lit all night long;

iii.      the shelters are open with no side walls and therefore nothing to block the view of the other children inside;

iv.      the camp, indeed all of Woodside Trails, is surrounded by a dense, wooded forest and it was dark when the alleged victim alleges the abuse occurred;

v.      a dark, densely wooded forest is a much more likely location for such illicit sexual behavior as it is likely more secluded and less visible, yet the alleged victim states specifically that abuse ONLY occurred at his bedside and at the fire pit, both in the middle of a lit camp surrounded by eleven other children and, at times, other counselors and/or employees of the facility, none of whom corroborated the alleged victim's admittedly false allegation of child sexual abuse; and

vi.      by the alleged victim's own statement, no abuse occurred off campus despite numerous opportunities as Mr. Reynolds took the alleged victim on many

- 31 -

therapeutic off-campus outings on which there would have been considerably fewer potential witnesses.

> h.      failed to give proper consideration to the complete and utter lack of ANY corroborating evidence—medical, physical, other witness statements, etc.;

> i.      failed to give proper consideration to the alleged victim's persistent recantation of abuse.

144.   Defendants Shaw and Loyd also had a duty to weigh the evidence in order to determine whether an act of sexual abuse actually occurred and to attempt to legitimately validate the abuse claim.

145.   Defendants Shaw and Loyd failed in this duty, choosing instead to misrepresent and invent evidence to buttress a weak allegation, as follows:

> a.      misrepresented the alleged victims recantation by stating in the report that he merely "inferred" he was not abused, when in fact the child stated outright sixteen times during that interview that he was NOT sexually abused;

> b.      claimed that recantations are common among child sexual abuse victims, an assertion that has little or no basis in fact;

> c.      claimed that the alleged victim's expressions of remorse over having made this false allegation were in fact evidence of guilt;

> d.      falsely and recklessly claimed that Mr. Reynolds had sexually explicit conversations and shared personal information with the alleged victim without therapeutic or administrative approval or knowledge;

> e.      included evidence in her report that was neither factually relevant to the allegation nor probative of whether a sexual assault actually occurred;

    f.  failed to familiarize herself with the nature and specifics of relationship-based therapy and therefore mischaracterized the nature of the therapeutic relationship between me and the alleged victim;

    g.  failed to challenge, or may have even elicited, blatantly false statements given by other children that were used in the report to bolster their finding;

    146. On information and belief, beginning in the Spring of 2004, as a direct result and consequence of the reckless and wanton abuse of power and authority by Defendant Strayhorn, it became the policy, practice or custom of Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond to presume guilty any Woodside Trails employee accused of child sexual abuse.

    147. It is the policy, practice or custom of DFPS to not consider recantations in their deliberations because child sexual abuse victims often recant the allegation.

    148. It is the policy, practice or custom of DFPS to use Child Sexual Abuse Accommodation Syndrome as a legitimate tool for diagnosing the occurrence of child sexual abuse despite its widespread repudiation, specifically in America's court systems.

    149. DFPS' unwritten rules about allegations of child sexual abuse (recantations are frequent, presumption of guilt, CSAAS, etc.) constitutes a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.

    150. Defendants Shaw and Loyd acted pursuant to these policies, practices and customs when Defendant Shaw ruled RTB in her investigation of alleged sexual abuse of a child and neglectful acts by Plaintiff on August 25, 2004.

    151. Defendants Shaw's and Loyd's conduct violate clearly established statutory and/or constitutional rights of which a reasonable person would have known.

152.   Defendant Shaw's actions are so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing.

153.   Defendant Shaw's failure of duty was willful, wanton, and malicious and shocks the conscience.

154.   By their subsequent conduct, Defendants Loyd, Martin, Bateman, Spiser, Eells and Chapmond and acting under the color of state law, ratified the wrongful conduct of Defendant Shaw intentionally and/or recklessly or through improper discharge of their duties to oversee and supervise.

155.   Defendant Shaw's RTB finding in this case was a substantial departure from accepted professional judgment applied in past investigations by her office related to allegations of abuse against employees at Woodside Trails as to demonstrate that Defendant Shaw actually did not base the decision on such judgment.

156.   Defendant Bateman's action in altering the investigator's finding of "unable to determine" on the allegation of neglect by Plaintiff in allowing children to engage in the Sun Dance religious ceremony, without obtaining any additional information or investigation was not objectively reasonable, and was arbitrary, capricious and related to the legitimate state goal of protecting the welfare of foster children.

157.   On information and belief, Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond's   conduct was vindictive; they intentionally treated Plaintiff differently without rational basis both as an individual and as distinguished from those similarly situated to her.

158.   On information and belief, Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond's conduct was motivated by ill-will and was undertaken on behalf

of and as a direct result and consequence of the reckless and wanton abuse of power and authority by Defendant Strayhorn with the intent to deprive Plaintiff of her civil rights or with reckless disregard of those rights.

159.    As a result of the above described acts, Plaintiff was foreseeably deprived of due process protected by the substantive component of the due process clause,  liberty without due process of law, right to equal protection of the laws, and the due course of justice was impeded in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

### COUNT III:    VIOLATION OF 42 U.S.C. § 1983

### 1.    ADMINISTRATIVE REVIEW

160.    Plaintiff incorporates by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

161.    Defendant Bateman acted under color of state law when upon receiving a request for an administrative review of the finding against Plaintiff assigned Defendant Martin, with whom Defendant Bateman has had a long-standing personal and professional relationship, to conduct all five administrative reviews related to Woodside Trails, including the review of findings against Plaintiff.

162.    Defendant Martin acted under color of state law when upon performing an administrative review of the finding that Mr. Reynolds sexually abused a child at Woodside Trails Therapeutic Camp upheld said finding and all other findings related to Woodside Trails, including the finding of neglectful supervision by Plaintiff.

163.    The Family Code, Subtitle E, Chapter 261, Subchapter D, paragraph 261.309, subparagraph (d) states in part that "if a civil or criminal court proceeding or an ongoing criminal investigation is pending, the department may postpone the review until the

court proceeding is completed." The code also states that "unless a civil or criminal court proceeding or an ongoing criminal investigation relating to the alleged abuse . . . is pending, the department employee shall conduct the [administrative] review . . . not later than the 45th day after the date the department receives the request."

164.    Mr. Reynolds' request for a review was received by DFPS on September 10, 2004 and formally acknowledged ten days later. Yet the administrative review was not scheduled until December 10, 2004, a full ninety days after they received the request. If the administrative review could not be postponed due to a pending "criminal court proceeding" despite my formal request they do so, then it should have occurred within 45 days of their receiving my letter requesting the review.

165.    On December 20, 2004, Mr. Reynolds sent a letter to Defendant Martin officially protesting Defendant Bateman's "unfair refusal to defer" the administrative hearing and asking that she consider certain pertinent facts "about the incomplete and biased investigation conducted by" DFPS.

166.    Defendant Bateman tainted the legitimacy of the Administrative Review process by assigning all RTB reviews related to Woodside Trails to one person. All RTB's were subsequently upheld.

167.    Defendant Bateman tainted the legitimacy of the Administrative Review process by advising Defendant Martin about the cases.

168.    Defendant Martin had a duty to fairly and independently evaluate all the evidence and determine whether the RTB disposition was accurate.

169.    Defendant Martin failed in this duty, as follows:

a.    she gave no consideration to the alleged victim's family history, DFPS record, and his three-year treatment history at Woodside Trails.

b.      she gave no consideration to the alleged victim's involvement with the "Permission to Lie" program at Woodside Trails, despite references to the alleged victim's involvement in the program by Plaintiff;

c.      she gave no consideration of the alleged victim's two prior threats to make a false allegation against  Mr. Reynolds, despite references to these threats by Plaintiff information provided to Defendant Martin;

d.      she gave no consideration to the alleged victim's own DFPS caseworker, Teresa Moran, who stated the alleged victim is "a sexual predator . . . [with a] history of lying . . . [who] has a hard time separating friendship from [sexual] grooming;"

e.      she gave no consideration to the alleged victim's initial denial of any sexual abuse by me;

f.      she gave no consideration to the inherent lack of believability of the alleged victim's allegations;

g.      she gave no consideration to the complete and utter lack of ANY corroborating evidence—medical, physical, other witness statements, etc.; and

h.      she gave no consideration to the alleged victim's recantation of abuse;

i.      she gave no consideration to evidence provided by Plaintiff that Mr. Reynolds was not working at Woodside Trails at any time when Plaintiff could have known of any alleged misconduct by Mr. Reynolds.

170.    On information and belief, beginning in the Spring of 2004, as a direct result and consequence of the reckless and wanton abuse of power and authority by Defendant Strayhorn, it became the policy, practice or custom of Defendants Shaw, Loyd, Martin, Bateman,

Spiser, Eells and Chapmond to presume guilty any Woodside Trails employee accused of child sexual abuse and to find Plaintiff responsible for neglectful supervision.

171.    It is the policy, practice or custom of DFPS and Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond to not consider recantations in their deliberations because child sexual abuse victims often recant the allegation.

172.    It is the policy, practice or custom of DFPS and Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond to use Child Sexual Abuse Accommodation Syndrome as a legitimate tool for diagnosing the occurrence of child sexual abuse despite its widespread repudiation, specifically in America's court systems.

173.    DFPS' unwritten rules about allegations of child sexual abuse (recantations are frequent, presumption of guilt, CSAAS, etc.) constitutes a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.

174.    Defendant Martin acted pursuant to these policies, practices or customs when she upheld the RTB disposition against Plaintiff.

175.    Defendant Bateman acted pursuant to these policies, practices or customs when she tainted the legitimacy of the administrative review process.

176.    The conduct of Defendants Bateman and Martin violates clearly established statutory and/or constitutional rights of which a reasonable person would have known.

177.    The actions of Defendants Bateman and Martin are so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing.

178.   Defendant Martin's failure of duty was willful, wanton, and malicious and shocks the conscience.

179.   Defendant Bateman's failure to ensure the legitimacy of the administrative review process was willful, wanton, and malicious and shocks the conscience.

180.   By their subsequent conduct, DFPS and all known and unknown supervisory employees of DFPS, Defendants Bateman, Spiser, Eells and Chapmond, acting under the color of state law, ratified the wrongful conduct of Defendant Martin intentionally and/or recklessly or through improper discharge of their duties to oversee and supervise.

181.   Defendant Bateman's decision to discuss the case with and assign all five RTBs relevant to Woodside Trails to a single person with whom she had a long-standing professional and personal relationship was a such a substantial departure from accepted professional judgment applied in past administrative reviews as to demonstrate that Defendant Bateman actually did not base her decision on such judgment.

182.   Defendant Martin's decision to uphold the RTB finding against Plaintiff despite the fact that the finding was not supported by a preponderance of the evidence was a substantial departure from accepted professional judgment applied in past administrative reviews related to allegations of abuse from children against employees of facilities licensed by DFPS as to demonstrate that Defendant Martin actually did not base the decision on such judgment.

183.   On information and belief, Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond's conduct was vindictive; they intentionally treated Plaintiff differently without rational basis both as an individual and as distinguished from those similarly situated.

184.   On information and belief, Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond's conduct was motivated by ill-will and was undertaken on behalf

of and as a direct result and consequence of the reckless and wanton abuse of power and authority by Defendant Strayhorn with the intent to deprive Plaintiff of her civil rights or with reckless disregard of those rights.

185.    As a result of the above described acts, Plaintiff was deprived of due process protected by the substantive component of the due process clause, my liberty without due process of law, the right to equal protection of the laws, and the due course of justice was impeded in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

### COUNT IV:      VIOLATION 42 U.S.C. § 1983

### 1.    CAROLE STRAYHORN

186.    Plaintiff incorporates by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

187.    Defendant Strayhorn acted under the color of law when upon issuing her report, "Forgotten Children," she began a campaign to close Woodside Trails down.

188.    The depth, intensity, and extent of Defendant Strayhorn's campaign against Woodside Trails went far beyond the normal agenda of a powerful, ambitious, and unscrupulous politician seeking higher office.

189.    Defendants Strayhorn, Ford and Anderson and other members of Strayhorn's staff from the Office of the Texas Comptroller of Public Accounts reported over 44 separate allegations to the abuse hotline, most, if not all of which were not only false but ridiculous.

190.    Defendants Strayhorn, Ford and Anderson and other members of Strayhorn's staff from the Office of the Texas Comptroller of Public Accounts demanded DFPS

account for why investigations of complaints against Woodside Trails regularly ruled-out violations, many of which were coming from Defendant Strayhorn's office.

191.   Defendants Strayhorn, Ford and Anderson and other members of Strayhorn's staff from the Office of the Texas Comptroller of Public Accounts contacted the Smithville, Bastrop, and Bastrop County law enforcement departments seeking any derogatory information they could use against Woodside Trails.

192.   It was the policy, practice or custom of Defendant Strayhorn's Office of the Texas Comptroller of Public Accounts to close Woodside Trails regardless of the manner in which this policy, practice or custom was implemented.

193.   Defendant Strayhorn was acting pursuant to this policy when, inter alia, her office reported false claims of abuse and neglect to the Texas Child Abuse and Neglect Hotline and pressured DFPS to rule against the facility and its employees in their investigations.

194.   Defendants Strayhorn, Anderson and Ford's conduct violates clearly established statutory and/or constitutional rights of which a reasonable person would have known.

195.   Defendants Strayhorn, Anderson and Ford's actions are so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing.

196.   Defendants Strayhorn, Anderson and Ford's actions in targeting Woodside Trails were willful, wanton, and malicious and shocks the conscience.

197.   Defendant Strayhorn's investigation of foster care generally, and Woodside Trails, specifically was beyond her lawful constitutional and statutory duties.

198.   On information and belief, Defendants Strayhorn, Anderson and Ford's conduct was vindictive and was motivated by ill-will with the intent to deprive all Woodside

Trails employees, including Plaintiff, of her civil rights or with reckless disregard of those rights. The unlawfulness of Defendants Strayhorn, Anderson and Ford's conduct would be apparent to a reasonably competent state official.  Defendants Strayhorn, Anderson and Ford's conduct set in motion events that would foreseeably cause the deprivation of Plaintiff's constitutional rights.

199.   As a result of the above described acts, Plaintiff was deprived of due process protected by the substantive component of the due process clause, liberty without due process of law, right to equal protection of the laws, right to be free of conscience shocking governmental action and the due course of justice was impeded in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983.

COUNT V:        **CONSPIRACY UNDER 42 U.S.C. § 1985**

**1.     TAINTED ADMINISTRATIVE REVIEW**

200.   Plaintiff incorporates by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

201.   Defendants Martin and Bateman acted under the color of state law when they entered into a conspiracy to deprive Plaintiff of a fair administrative review.

202.   Defendants Martin and Bateman entered into the conspiracy for the purpose of depriving Plaintiff of her fundamental legal and constitutional rights.

203.   The Family Code, Subtitle E, Chapter 261, Subchapter D, Paragraph 261.309, Subparagraph (c) states, "If . . . the person who is alleged to have abused or neglected a child disputes the department's determination of whether child abuse or neglect occurred . . . [a] department employee in administration *who was not involved in* . . . the investigation shall conduct [an administrative] review."

- 42 -

204.    On information and belief, Defendant Bateman assigned all RTB reviews related to Woodside Trails to Defendant Martin, with whom Defendant Bateman has had a long-standing personal and professional relationship. All RTB's were subsequently upheld.

205.    Defendant Bateman communicated with Defendant Martin about the investigations and requests for administrative reviews beginning as early as September 15, 2004.

206.    The Family Code, Subtitle E, Chapter 261, Subchapter D, paragraph 261.309, subparagraph (d) states in part that "if a civil or criminal court proceeding or an ongoing criminal investigation is pending, the department may postpone the review until the court proceeding is completed." The code also states that "unless a civil or criminal court proceeding or an ongoing criminal investigation relating to the alleged abuse . . . is pending, the department employee shall conduct the [administrative] review . . . not later than the 45th day after the date the department receives the request."

207.    On December 6, 2004, Mr. Reynolds asked that the administrative review be deferred "until after the criminal case . . . has been dismissed . . ."

208.    On December 8, 2004, Defendant Bateman responded by denying the request stating that their "investigation and findings are separate from the police investigation and are not dependent upon whether or not criminal charges are filed."

209.    On information and belief, beginning in the Spring of 2004, as a direct result and consequence of the reckless and wanton abuse of power and authority by Defendant Strayhorn, it became the policy, practice or custom of Defendant DFPS to presume guilty any Woodside Trails employee accused of child sexual abuse.

210.    Defendants were acting pursuant to this new policy, practice or custom when they entered into the conspiracy to deprive Plaintiff of a fair and impartial administrative review.

211.   Defendants' conduct violates clearly established statutory and/or constitutional rights of which a reasonable person would have known.

212.   Defendants' actions are so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing.

213.   By their subsequent conduct, Defendants acting under the color of state law, ratified the wrongful conduct of Defendants Martin and Bateman intentionally and/or recklessly or through improper discharge of their duties to oversee and supervise.

214.   On information and belief, Defendants conduct in conspiring to deprive Plaintiff of a fair administrative review was vindictive and was motivated by ill-will toward Woodside Trails and its former or current employees and was undertaken on behalf of and as a direct result and consequence of the reckless and wanton abuse of power and authority by Defendant Strayhorn with the intent to deprive Plaintiff of her rights or with reckless disregard of those rights.

215.   As a result of the above described conspiracy, Plaintiff was deprived of due process protected by the substantive component of the due process clause, liberty without due process of law, the right to equal protection of the laws, and the due course of justice was impeded in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1985.

**COUNT VI:**     **CONSPIRACY UNDER 42 U.S.C. § 1985**

216.   The Licensing Investigation Report issued by DFPS, authored by Defendant Shaw and approved by Defendants Loyd, Martin, Bateman, Spiser, Eells and Chapmond indicates the investigation did not conclude until August 31, 2004. Two separate

entries in the report relating to interviews with witnesses, neither of which is corroborative, are dated after the finding of abuse by Mr. Reynolds and neglectful supervision by Plaintiff.

217.   In the report, Defendant Shaw writes that on August 16, 2004 the alleged victim "started to infer that Mr. Reynolds" had not sexually abused him.

218.   On September 18, 2004, Defendant Shaw and her supervisor, Defendant Loyd, both falsely denied any knowledge of the recantation.

219.   On September 22, 2004, a news reporter called DFPS seeking to confirm existence of Joseph D's recantation.

220.   On September 24, 2004, Defendant Loyd admitted to Defendant Bateman that the alleged victim recanted, but neither would confirm this information to anyone outside their office.

221.   Defendants' conduct violates clearly established statutory and/or constitutional rights of which a reasonable person would have known.

222.   Defendants' actions are so obviously wrong, in the light of preexisting law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing.

223.   By their subsequent conduct, Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond intentionally and/or recklessly or through improper discharge of their duties to oversee and supervise, deprived Plaintiff of her civil rights or acted with reckless disregard of those rights.

224.   On information and belief, the conduct of Defendants Shaw, Loyd, Martin, Bateman, Spiser, Eells and Chapmond in conspiring to conceal the recantation was vindictive and was motivated by ill-will toward Woodside Trails and its former or current employees and was undertaken on behalf of and as a direct result and consequence of the reckless and wanton

abuse of power and authority by Defendant Strayhorn with the intent to deprive Plaintiff of civil rights or with reckless disregard of those rights.

225.    As a result of the above described conspiracy, Plaintiff was deprived of due process protected by the substantive component of the due process clause, liberty without due process of law, my right to equal protection of the laws, and the due course of justice was impeded in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1985.

### COUNT VII:      VIOLATION OF THE TEXAS CONSTITUTION

226.    Plaintiff incorporates by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

227.    As a result of Defendants' acts as described above in Counts I through X, Plaintiff was deprived of rights and liberties secured by the Texas Constitution. Specifically, Plaintiff was deprived of the following rights under Article 1 of the Texas Constitution:

a.    Equal Rights as defined by Section Three.

b.    Right to not be deprived of liberty without due course of law as defined in Section Nineteen.

### COUNT VIII:      GROSS NEGLIGENCE

228.    Plaintiff incorporates by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

229.    The actions of the Defendants described herein show an entire want of care that raises the belief that the acts and omissions complained of were the result of a conscious indifference to Plaintiff's rights or welfare.

230.    The actions of the Defendants involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff.

231.    The Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to Plaintiff's rights, safety, or welfare.

232.    The Defendants were aware of the risk of some genuine and unjustifiable harm to Plaintiff that their actions would likely result in.

233.    The Defendants had a legal, moral, and ethical duty to adhere to a standard of conduct in protecting Plaintiff from unreasonable risk of harm.

234.    The Defendants' conduct violated clearly established statutory and/or constitutional rights of which a reasonable person would have known.

235.    The Defendants' actions are so obviously wrong, in the light of preexisting law, that only a plainly incompetent person or one who was knowingly violating the law would have done such a thing.

236.    Defendants' actions described above did actually and proximately cause Plaintiff to suffer extreme injuries including but not limited to loss to reputation or character, humiliation, physical and mental suffering, distress, embarrassment, impairment of social standing, and loss of employability and earnings.

237.    Said conduct, described above, constitutes Gross Negligence for which Defendants are liable under the laws of the State of Texas for the damages caused.

**COUNT IX:**        **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

238.    Plaintiff incorporates by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

239.    The conduct of the Defendants described above was intentional, extreme, outrageous, without privilege or justification and transcended all bounds of decency.

240.   Defendants intended by their conduct to inflict emotional distress upon Plaintiff or knew or should have known that emotional distress was the certain consequence of such illegal, reckless, unwarranted, extreme and outrageous actions.

241.   Defendants' actions described above did actually and proximately cause Plaintiff to suffer extreme injuries including but not limited to loss to reputation or character, humiliation, physical and mental suffering, distress, embarrassment, nervous shock, impairment of social standing, and loss of employability and earnings.

242.   Said conduct, described above, constitutes intentional infliction of emotional distress for which Defendants are liable under the laws of the State of Texas for the damages caused.

## COUNT X:   ABUSE OF PROCESS

243.   Plaintiff incorporates by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

244.   Defendants actions and conducted described above indicates the Defendants knowingly used civil legal processes for purposes for which they were not designed. Defendants actions described above did actually and proximately cause Plaintiff to suffer extreme injuries including but not limited to loss to reputation or character, humiliation, physical and mental suffering, distress, embarrassment, nervous shock, impairment of social standing, and loss of employability and earnings.

245.   Defendants' wrongful conduct constitutes abuse of process, which caused damage and for which Defendants are liable under the laws of the State of Texas.

## COUNT XI:   PUNITIVE DAMAGES

246.   Plaintiff incorporates by reference, as if fully set forth herein, each and every one of the foregoing paragraphs.

- 48 -

247.    Defendants actions, as described above, were willful, wanton, malicious and outrageous.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in her favor and the following relief against Defendants:

a.      award Plaintiff compensatory damages;

b.      award Plaintiff punitive damages against the individual Defendants;

c.      award Plaintiff reasonable attorney's fees, costs and expenses; and

d.      award Plaintiff such further relief as deemed just and appropriate.

Respectfully submitted,

HULL, HENRICKS & MACRAE LLP
221 W. Sixth St., Suite 2000
Austin, Texas 78701
(512) 472-4554
(512) 494-0022 (fax)

By: _____
    Susan Henricks
    State Bar No. 09475200

**ATTORNEY FOR PLAINTIFF**
**BETTY LOU GAINES**