**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **BETTY LOU GAINES,** | § | |
| | § | |
| **v.** | § | **A-06-CA-673 LY** |
| | § | |
| **CAROLE STRAYHORN, ET AL.** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:  THE HONORABLE LEE YEAKEL
     UNITED STATES DISTRICT JUDGE

Before the Court are the Comptroller Defendants' Rule 12(b)(6) Motion to Dismiss, filed October 11, 2006 (Clerk's Doc. No. 22); and Motion to Exclude Report filed by Comptroller Defendants, filed December 13, 2006 (Clerk's Doc. No. 40). The District Court referred the dispositive motion to the undersigned Magistrate Judge for a Report and Recommendation as to the merits pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges. After reviewing the parties' briefs, relevant case law, as well as the entire case file, the undersigned issues the following Report and Recommendation to the District Court. The Court held a hearing on the motion on January 23, 2007.[1]

**I. BACKGROUND**

The Comptroller Defendants are Carole Strayhorn, Vicki Anderson, and Ruthie Ford. At the time of the events on which this suit is based, Strayhorn was the Comptroller for the State of Texas,

---

[1]Due to multiple requested extensions of time, the Plaintiff's response to the Comptroller's motion was not filed until December 13, 2006.

and Anderson and Ford worked for her at the Comptroller's office. The events which precipitated this suit was Woodside Trails (or "the Camp") – where Plaintiff was Executive Director (and, apparently, administrator and President) – being shut down by the Texas Department of Family and Protective Services (TDFPS)[2]. The crux of Defendants' 12(b)(6) motion is whether Plaintiff's Complaint pleads facts sufficient to state a claim that Strayhorn's involvement in the process of shutting down the Camp violated Plaintiff's constitutional rights.

Plaintiff worked at the Camp on and off for 20 years, held a Child Care Administrator's license (through TDFPS), and served on a number of boards dealing with what might be called children's behavioral counseling organizations; one board she chaired. Plaintiff asserts that she is "intimately and totally identified with Woodside Trails, both in Texas and nationally." *See* Plaintiff's Second Amended Complaint, at 5. In 2003, Plaintiff was voted by the Board – consisting of her friends and family – to be Executive Director of Woodside Trails; this process was repeated in June 2004. The Camp's mission was to serve severely emotionally disturbed adolescent boys, many of whom were sexual offenders. In the jargon, the Camp was known as a "primitive therapeutic camp" because it utilized the natural environment to provide therapy for the boys, such as having them construct semi-permanent structures (which they would later sleep in, at least some of the time).

At about the same time that Plaintiff became Executive Director of the Camp in 2003, Strayhorn became aware, via a story in the *Dallas Morning News*, of what she perceived to be a major problem in the state of foster care facilities in Texas. Strayhorn criticized TDFPS for lax regulation of these facilities and, according to Plaintiff, "bombarded [TDFPS] with multiple,

---

[2]This is the latest name change *cum* acronym for TDFPS which was previously known as the Texas Department of Protective and Regulatory Services.

extensive, and burdensome demands for information, analyses, and action," much of it focused on Woodside Trails. *See* Plaintiff's Response at 7. Subsequently, the Comptroller's office released "A Special Report on the Texas Foster Care System" entitled "Forgotten Children."[3] In that Report, Strayhorn depicted the worst of the foster care facilities, and included pictures of Woodside Trails (although neither the camp nor Plaintiff were mentioned by name in the Report).

Strayhorn's Report sparked intensified media interest; a local television reporter did a story on Woodside Trails that portrayed the Camp in a positive light. Plaintiff contends that after the Report's issuance, the Defendants (specifically Strayhorn) took a particularly nefarious obsession with Woodside Trails, attacking it for not meeting "permanent camp" standards even though it is a "primitive camp." Strayhorn's recommendation to shut down all camps not meeting the licensing standards for permanent therapeutic camps would have immediately shut down Woodside Trails.

The Defendants, Plaintiff alleges, went further: they called a child abuse hotline 40 times to make deceitful reports of violations at the Camp. They also reported to TDFPS that Plaintiff was "exposing children to sexual assault and to imminent danger" and leaned on TDFPS to explain why it had not closed any of the camps in light of the Report. Defendants further allowed, or instructed their employees to allow, reporters from a San Antonio TV station to accompany them on a "follow up inspection" of Woodside Trails by posing as state employees. The Defendants also authorized the reporters and crew to fly a helicopter over the Camp and film the children. They contacted former Camp employees talking in depth only to those who were disgruntled and willing to disparage

---

[3]The Plaintiff filed a Motion to Exclude from the Court's consideration the contents of this report, which the Defendants' had originally attached to their Rule 12(b)(6) Motion. The Defendants, in response to Plaintiff's Motion to Exclude, assented, stating that they "do not object to this court excluding the report from consideration when deciding their Rule 12(b)(6) motion." *See* Comptroller Defendants' Response to Motion to Exclude at 2 (Clerk's Doc. No. 46). Therefore, the Court will not consider the report.

the Camp. They reported violations to OSHA and to the Bastrop County Health and Sanitation Department. They questioned local pharmacists about pharmaceuticals taken by the children. They obtained a copy of Plainitff's marriage certificate and her husband's expunged juvenile record.

On August 25, 2004, TDFPS revoked the Camp's license – thereby effectively shutting it down – citing 32 violations of "minimum standards." *See* Plaintiff's Response at 15. Other camps, which had four and nearly five times the number of violations as Woodside Trails were not shut down. As an alternative to revocation of its licence, the Camp was not allowed the option of utilizing a "corrective action plan," despite the fact that other camps were given this option. Plaintiff contends that the only reason her camp was shut down was because TDPFS decided that kowtowing to Defendants' pressure was the only way to avoid political recriminations. On February 18, 2005, via a letter from an employee, TDFPS revoked Plaintiff's Child Care Administrator's license.

In August 2006, Plaintiff filed this suit, claiming (via §§ 1983 and 1985) violations of her procedural and substantive due process, equal protection, First Amendment, Fourth Amendment, and Fifth Amendment rights. On October 11, 2006, the Comptroller Defendants filed their motion to dismiss what at that time was the First Amended Complaint. After several extensions of time to respond were granted, on December 13, 2006, the Plaintiff responded to the 12(b)(6) motion, and also filed a motion seeking leave to file her Second Amended Complaint. With regard to the Comptroller Defendants, the Second Amended Complaint seeks to add one claim and two new defendants. Further, it adds a little more "flesh" to the First Amendment retaliation claim, as well as to the equal protection claim. The Comptroller Defendants have objected to the amendment, arguing that the amendment would be futile because the proposed Fourth Amendment claim to be added against them is time-barred and fails to state a claim. In a separate Report & Recommendation

4

issued today, the Court has concurred with this argument. For purposes of this motion, therefore, the Court focuses on the claims stated in the Second Amended Complaint (other than the Fourth Amendment claim) and the arguments made in the Plaintiff's response. Notably, with the Second Amended Complaint, the Plaintiff decided to drop all of her pendent state law claims against the comptroller Defendants, and thus the claims before the Court on this motion are only the federal claims made against the Comptroller Defendants.[4]

## II. DISCUSSION

Under Federal Rule of Civil Procedure 12(b)(6), "a claim will not be dismissed unless the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Gen. Elec. Capital Corp. v. Posey*, 415 F.3d 391, 395 (5th Cir. 2005). "A district court cannot dismiss a complaint for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief.'" *United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 653-54 (5th Cir. 2004). The complaint must be liberally construed in favor of the plaintiff and all facts pleaded therein must be taken as true. *Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003). "However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Jones v. Alcoa, Inc.*, 339 F.3d 359, 362 (5th Cir. 2003).

### A.     Procedural Due Process Claim

The Comptroller Defendants make a number of arguments regarding Plaintiff's procedural due process claims. Each is taken up in turn.

---

[4] In her Response to the Rule 12(b)(6) Motion Plaintiff contends that she is also advancing a § 1986 cause of action. There is not, however, a § 1986 claim made in either the First or Second Amended Complaints, and the Court will treat this statement in the response as an error.

1.     **Plaintiff's Property Interest in Woodside Trails**

The Defendants first argue that Plaintiff does not have a constitutionally protected property interest in Woodside Trails, and therefore her procedural due process claim against them should be dismissed.  Because the Constitution protects – rather than creates – property interests, the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law.  *Phillips v. Washington Legal Foundation*, 524 U.S. 156, 164 (1998).  "The hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except for cause."  *Woodard v. Andrus*, 419 F.3d 348, 354 (5th Cir. 2005).

Defendants, in support of their proposition that Plaintiff does not have a property interest in Woodside Trails, cite *Gregory v. Mitchell*, a 1981 Fifth Circuit case that held that the district court properly dismissed a § 1983 claim brought by the shareholders in a state chartered bank because the plaintiffs did not have standing: "neither officers nor stockholders  . . . can maintain an action to redress an injury to the corporation even though the value of their stock is impaired as a result of the injury."  *Gregory v. Mitchell*, 634 F.2d 199, 202 (5th Cir. 1981).  They also cite a recent First Circuit case noting that it is a "tenet" of the law of corporations that "[a]ctions to enforce corporate rights or redress injuries to [a] corporation cannot be maintained by a stockholder in his own name . . . even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the stock."  *Pagan v. Calderon*, 448 F.3d 16, 28 (1st Cir. 2006).

Plaintiff, in her Second Amended Complaint, states that "Woodside Trails is a Texas non-profit corporation."  *See* Second Amended Complaint, ¶ 23 at 6.  Under Texas law, just as non-profit corporations do not differ from the more traditional, profit-based model in their capacity to sue and be sued, *see Macedonia Baptist Church v. Gibson*, 833 S.W.2d 557, 559 (Tex. App. – Texarkana,

1992) (writ denied), an officer, owner, or executive of a non-profit corporation may not sue individually to recover for injuries done to the corporation. *Pagan*, 448 F.3d at 28; *see also Gregory*, 634 F.2d at 202. Plaintiff contends that her rights and duties in connection with the Camp "cover[] all the incidents of ownership that title would convey." *See* Plaintiff's Response at 29 (Clerk's Doc. No. 43) (stating that Plaintiff was the Executive Director elected by family members, and the Camp "could not be closed or transferred without her consent"). Even granting that all of Plaintiff's assertions are true, her argument misses the point. She has no constitutionally protected property interest for the very reason the *Pagan* and *Gregory* courts noted: the *corporation* must sue to vindicate its own rights, and a shareholder or executive cannot stand in its shoes. *Pagan*, 448 F.3d at 28. Therefore, the Court recommends that Plaintiff's procedural due process cause(s) of action, insofar as they claim a property interest in Woodside Trails, be dismissed.

**2.     Plaintiff's Property Interest in Her Job and License**

Defendants next arguments are that: (1) Plaintiff has no property interest in her employment status at Woodside Trails, and (2) they did not deprive Plaintiff of her property interest in her child care license.

Texas is an at-will employment state and the issue of whether there is "[a] property interest in employment . . . must be decided by reference to state law." *Bishop v. Wood*, 426 U.S. 341, 344 (1976). In Texas, there exists a presumption that employment is at-will unless that relationship has been expressly altered in one of two ways: (1) via contract; or (2) express rules or policies limiting the conditions under which an employee may be terminated. *Muncy v. City of Dallas*, 335 F.3d 394, 398 (5th Cir. 2003). Defendants point out that Plaintiff does not plead or allege that either alteration took place, and further point out that Plaintiff was never fired (and is still a member of the Camp's

Board). In response, at the hearing regarding this motion, Plaintiff pointed the Court to ¶ 21 of Second Amended Complaint where she alleges that "There was a universal explicit understanding and agreement among the board members that she was not an employee at will, but was guaranteed employment at Woodside Trails . . . [from] year to year." *See* Second Amended Complaint at 5-6.[5]

While Plaintiff may have a recognizable property interest in her job for purposes of a procedural due process claim, Plaintiff is overlooking the fact that the *Comptroller Defendants* are incapable of having violated that property interest, in that they were not the agency that revoked the Camp's license. At bottom, Plaintiff is complaining that, when the Camp was effectively shut down by TDFPS, her employment *de facto* terminated because she had no more clients. Put differently, while Plaintiff may allege that the Comptroller Defendants caused her to lose her job, that is not enough to state a procedural due process claim against the Comptroller Defendants. It would have been impossible, by virtue of their very position in the structure of Texas state government, for the Comptroller Defendants to provide Plaintiff any procedures that would satisfy due process *at all*. The Comptroller's Office and its employees did not, and could not, unilaterally shut Woodside Trails down, and therefore cause Plaintiff to lose her job (if in fact she has lost that job). Rather, the entity with a due process duty under the Constitution is the entity that revoked the Camp's and the Plaintiff's licenses - TDFPS. Thus, the procedural due process claim against the Comptroller Defendants is groundless. Thus, to the extent the Plaintiff has a claim against the Comptroller Defendants, the claim must be a substantive due process cause of action (which are taken up below).

---

[5] Defendants' cite a Texas Supreme Court case for the proposition that the "employer must unequivocally indicate a definite intent to be bound not to terminate the employee except under clearly specified circumstances." *Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998). While this is no doubt the case, the Court would be engaging in weighing just how "unequivocal" or "definite" the intent of the Camp's agreement with Plaintiff was if it were to grant the motion to dismiss on this issue. This is not appropriate at this stage of the litigation.

This same issue bleeds into the Defendants' next argument: Plaintiff's allegations that she was deprived of procedural due process, because of the state administrative (SOAH) proceedings accorded her were inadequate. Plaintiff contends that the SOAH process "did not provide meaningful due process to Plaintiff because [the hearings] did not occur before the state had already damaged her reputation, closed her camp, abruptly removed foster children in her care and prohibited her from contacting those children and deprived her of the use and benefit of her child care administrator's license." *See* Plaintiff's Response, at 31 (Clerk's Doc. No. 43).

As with the prior issue, there is no need to get into the niceties of procedural due process law in a § 1983 cause of action to resolve this issue.[6] Instead, it only needs to be noted that it was TDFPS, not the Defendants, that deprived Plaintiff and her Camp of licenses, and it was *only* TDFPS that had the statutory power to do so, and thus it was only TDFPS that had the corresponding legal duty to provide due process to Plaintiff. It is worth noting here that the Court is not saying that its eyebrows have not been raised by the treatment of Plaintiff in this case. Nor is the Court intimating that Plaintiff can assert no procedural due process claims against any of the named defendants. The Court is merely making clear that the defendants tagged with depriving Plaintiff of her procedural due process rights must be those who actually had a hand in depriving Plaintiff of her license.

Given the foregoing, the Court recommends that all claims Plaintiff has made against the Comptroller Defendants regarding her license or employment at Woodside Trails be dismissed.

---

[6]The issue, it seems, would turn on availability of pre- verus post-deprivation notice and hearing. *See, e.g., Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542 (1985) ("The root requirement of the Due Process Clause is that an individual be given an opportunity for a hearing before he is deprived of any significant protected interest").

**B.      Substantive Due Process**

Defendants contend that Plaintiff's claims under the other wing of Fourteenth Amendment due process jurisprudence – substantive due process – must also fail, because their conduct cannot be classified as arbitrary or conscience shocking.  The Supreme Court's last major pronouncement on the contents of a substantive due process claim came in *County of Sacramento v. Lewis*, 532 U.S. 833 (1998).  The Court reiterated and reinforced its half-century old "shock the conscience" test, *see Rochin v. California*, 342 U.S. 165 (1952), stating that "conduct that shocks the conscience and violates the decencies of civilized conduct" in turn violates due process rights.  *Lewis*, 532 U.S. at 847.  *See also Breithaupt v. Abram,* 352 U.S. 432, 435 (1957) (reiterating that conduct that " 'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency" would violate substantive due process); *Whitley v. Albers*, 475 U.S. 312, 327 (1986) (same); *United States v. Salerno*, 481 U.S. 739, 746 (1987) ("So-called substantive due process prevents the government from engaging in conduct that shocks the conscience . . . or interferes with rights implicit in the concept of ordered liberty'").  Squarely put, Justice Souter, writing for the Court, stated that, "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense."  *Lewis*, 523 U.S. at 847 (citations omitted).

The phrase "in a Constitutional sense" is important.  Substantive due process is not meant as "a 'font of tort law to be superimposed upon whatever systems may already be administered by the States.'"  *Id*. at 848 (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)).  Put differently, "the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."  *Id*. (quoting *Daniels v.*

10

*Williams*, 474 U.S. 327, 328 (1986). Instead, only "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id*.

In her pleading, Plaintiff lists the following actions – worth reiterating here – that she argues rise to the level of conscience-shocking behavior, as a matter of law:

- Strayhorn lacked legal authority to carry out her investigation into Texas's foster care system.

- The investigation was motivated solely by Strayhorn's gubernatorial ambitions.

- Defendants have refused to retract or modify the many alleged inaccuracies and falsehoods in the "Forgotten Children" report.

- Defendants, angry that Plaintiff spoke out against them and defended herself, retaliated against her.

- In order to get TV reporters onto the grounds at Woodside Trails to secretly film Plaintiff and some of the foster children, Defendants lied about their affiliation.

- Acting as Defendants' agents, TV reporters flew over the Camp in a helicopter at a low attitude to film the Camp and its inhabitants.

- Defendants, during the course of their investigation, obtained Plaintiff's marriage license and her husband's expunged juvenile record.

- Defendants contacted the Camp's local pharmacy to obtain confidential drug prescription information about the Camp's employees and the foster children there.

- Defendants used local law enforcement agents in a similar manner.

- The Defendants made false reports to OSHA about working conditions at the Camp.

- Defendant Ford threatened a chairwoman of the Camp, who also happened to be a state employee, with negative employment actions because of her service with the Camp.

Plaintiff is of course correct that Defendants' burden in a motion to dismiss is high, but the same holds true for her burden in advancing a substantive due process claim. The Fifth Circuit has

11

held, for example, that a county hospital's failure to screen blood such that plaintiff was infected with HIV is only negligent behavior, and does *not* shock the conscience. *Kinzie v. Dallas County Hosp. Dist.*, 106 Fed. App'x 192, 194 (5th Cir. 2003). Conversely, the Fifth Circuit held that where a teacher fabricated a charge of sexual abuse against a student's father – the girl was four years old and the teacher guided her hands over a keyboard to type out the allegation – *did* shock the conscience. *Morris v. Dearborne*, 181 F.3d 657, 668 (5th Cir. 1999).

No doubt much of the Defendants' behavior in this case, delineated above, is untoward and petty. No doubt much of the behavior is (much) less than one would expect from an elected official or her staff. However, the Court cannot go further than that. It cannot say, even with all of the excesses and misjudgments of this investigation, that Defendants' "conduct *intended to injure* [Plaintiff] in some way *unjustifiable by any government interest*." *Lewis*, 523 U.S. at 848 (emphasis added). Put differently, Defendants' conduct here does not, in the same way the teacher's fabrication of sexual abuse claim did, shock the judicial conscience. *See Perez v. Unified Govt. Of Wyandotte County/Kansan City, Kan.*, 432 F.3d 1163, 1168 n.4 (10th Cir. 2005) (issue of conscience-shocking behavior as it pertains to substantive due process is a question of law for the Court, not a question of fact for the jury). That is to say, Texas surely has a governmental interest in being aware of and vigilantly investigating the state of foster child care in Texas, particularly given that foster children are a politically powerless constituency saddled with the burden of being unable to vote or champion their own cause. Because the Court finds that, even taking as true all of the Plaintiff's allegations regarding the Comptroller Defendants' actions, that the conduct does not shock the conscience, the substantive due process claim should be dismissed.

Defendants also argue that the substantive due process claim must be dismissed under the *Noerr-Pennington* doctrine. The *Noerr-Pennington* doctrine is grounded in the First Amendment right to petition the government. Originally, it provided that parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though if their petitioning is motivated by anti-competitive intent. *Gibbes v. Ameristar Casino Vicksburg Inc.*, 137 F. App'x 673, 674 n.2 (5th Cir. 2005). The doctrine has its origins in two U.S. Supreme Court cases: *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers of America v. Pennington*, 381 U.S. 657(1965). Plaintiff argues that the Fifth Circuit has not applied the *Noerr-Pennington* doctrine outside the field of antitrust law, and urges the Court to follow the Fifth Circuit case *Video International Production, Inc. v. Warner-Amex Cable Communications, Inc.*, 858 F.2d 1075 (5th Cir. 1988). There, the Fifth Circuit noted that the "point of the *Noerr-Pennington* doctrine is to protect private parties when they petition the government for laws or interpretations of its existing laws even though those private parties are pursuing their goals with anticompetitive intent." 858 F.2d at 1083.

This argument ignores the more recent case of *Bayou Fleet, Inc. v. Alexander*, a Fifth Circuit case from 2000. There, the Circuit stated that "[a]lthough the Supreme Court has limited its discussion of *Noerr-Pennington* immunity to cases involving antitrust litigation, this Court has extended the *Noerr-Pennington* doctrine to include claims under section 1983." *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 859 (5th Cir. 2000).[7] Plaintiff's argument also fails to recognize the clear trend among the federal courts to extend the *Noerr-Pennington* doctrine beyond antitrust law. *See*

---

[7] There is also authority for the proposition that the Supreme Court has applied *Noerr-Pennington* outside of the antitrust context. *See e.g., Barnes Foundation v. Township Lower Merion*, 242 F.3d 151 (3d Cir. 2001).

*e.g., Herr v. Pequea Township*, 274 F.3d 109, 115 (3d Cir. 2001) (*overruled on other grounds*, *United Artists Theatre Circuit, Inc. v. Township of Warrington, PA*, 316 F.3d 392, 400 (3d Cir. 2003) ("principles relied upon [under the *Noerr-Pennington* doctrine] are not limited to antitrust liability" and "[t]he First Amendment right to petition extends to all departments of government . . . [t]he protection it affords thus applies . . . to petitioning state agencies."); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 615 (8th Cir. 1980) (section 1983) (landowners' secret meetings with city officials to petition for enactment of city ordinance to rezone plaintiff's property within doctrine)**;** *Sawmill Products, Inc. v. Town of Cicero*, 477 F. Supp. 636, 642 (N.D. Ill.1979) (section 1983) (protesting presence of plaintiff's sawmill which was then shut down by town ordinance); *Weiss v. Willow Tree Civic Ass'n*, 467 F. Supp. 803, 816-18 (S.D.N.Y. 1979) (section 1983) (lobbying town officials and filing groundless judicial and administrative complaints to oppose zoning permit); *Aknin v. Phillips*, 404 F.Supp. 1150, 1153 (S.D.N.Y. 1975), *aff'd*, 538 F.2d 307 (2d Cir. 1976) (section 1983) (urging officials to enforce unconstitutionally vague noise ordinance against plaintiff's discotheque); *Sierra Club v. Butz*, 349 F. Supp. 934, 938-39 (N.D. Cal. 1972) (contractual interference) (filing lawsuit and administrative appeals to halt plaintiff's logging operation; filings constitutionally privileged even if motivated by malice)).[8]

---

[8] Plaintiff also argues that the *Noerr-Pennington* doctrine only applies to private persons, not government officials. Defendants cogently argue that Plaintiff is suing them in their individual, not official, capacities – as they must, *see Esteves v. Brock*, 106 F.3d 674, 677 (5th Cir. 1997) ("As a state officer acting in her official capacity, however, Brock is protected by the Eleventh Amendment from suit under section 1983 for money damages") – therefore she cannot deny that *Noerr-Pennington* applies in this case because the case law *infra*, e.g. *Herr*, 274 F.3d 109 (3d Cir. 2001), holds that the immunity attaches to officials sued in the individual capacity (and even the dissent, whose reasoning the Plaintiff champions, agrees with this point). Therefore, the whole issue of whether *Noerr-Pennington* immunity is only available to private parties is moot because all the Defendants *are* private parties being sued in their individual capacity.

Plaintiff's other argument regarding the *Noerr-Pennington* doctrine is that "the actions of the Comptroller Defendants went well beyond appropriate petitioning activity" that the *Noerr-Pennington* Doctrine would protect.[9] The Third Circuit has squarely held that *Noerr-Pennington* immunity protects the petitioning activity of public entities, at least so long as the protected petitioning activity constitutes the petitioning of a distinct public entity authorized by state law to resolve the issue at stake. *See Herr*, 274 F.3d at 119; *Mariana v. Fisher*, 338 F.3d 189 (3d Cir. 2003). A publicity campaign directed at the general public and seeking government action is covered by *Noerr-Pennington* immunity. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499-500 (1988). In *Manistee Town Center v. City of Glendale*, 227 F.3d 1090 (9th Cir. 2000), the Ninth Circuit held that Glendale, the city, was protected by *Noerr-Pennington* immunity for its lobbying of the county (Maricopa). *Id*. at 1093.[10]

Here, the Defendants lobbied TDPFS to take action on a problem they thought important: the state of foster care in Texas. *Stern v. United States Gypsum, Inc.*, 547 F.2d 1329 (7th Cir. 1977), a § 1985 case, is also enlightening.[11] There, *Noerr-Pennington* immunity was extended to executives

---

[9] That is, Plaintiff argues, some of the activity enumerated above cannot be classified as petitioning activity. This is true, but, as the Court has just found, that activity, in any event, does not violate her substantive due process rights.

[10] The Court is aware of the "sham" litigation exception to *Noerr-Pennington* immunity, however, it is difficult to see how that exception would apply to this case and neither party briefed this point. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993) (defining the "sham" exception to *Noerr-Pennington* immunity to include "only lawsuits that are both objectively baseless and subjectively intended to abuse process").

[11] It is worth noting the peculiar nature of the facts in this case. As discussed in the text, Defendants, even though government employees when the "campaign" against Woodside Trails took place, are for purposes of this suit private citizens. *See infra* note 7. Therefore, cases where the defendants are government officials *and* cases where the defendants are private citizens are instructive for present purposes.

at the defendant company even though they made charges they knew to be false about an IRS agent to his superiors. *Id*. at 1342-46. Given this, whether Defendants are viewed as government officials lobbying another branch of government or private citizens (who are employed by the government ) their lobbying for action on a *cause celebre*, is a petitioning activity protected by *Noerr-Pennigton*'s grant of immunity. *Bayou Fleet*, 234 F.3d at 859 ("*Noerr-Pennington* immunity applies to any concerted effort to sway public officials regardless of the private citizen's intent"). This is an additional reason for dismissal of Plaintiff's substantive due process claims against the Comptroller Defendants.

## C.     Equal Protection

Defendants also argue that Plaintiff's Equal Protection clause claim must be dismissed because Plaintiff fails to identify a similarly situated person or entity that was treated differently. Plaintiff counters that she has stated a claim under the Equal Protection clause because she was not offered so-called "risk evaluation" – a procedure "which might have allowed her to remain in contact with children [who were removed by TDFPS] after the evaluation was completed" – that was offered to other counselors similarly situated. *See* Plaintiff's Response at 32 (Clerk's Doc. No. 43). Plaintiff further contends that Woodside Trails was subjected to increased scrutiny than were other camps, and, moreover, camps that had more regulations violations – both in quantity and in quality – were given more lenient compliance options.[12]

Defendants question, rightly, how the Equal Protection clause violation can be laid at their feet, when the injuries complained of are injuries to Woodside Trails, not Plaintiff, and, moreover, the complained-of actions were taken by TDFPS, not the Comptroller's Office. "A party who wishes

---

[12]While Plaintiff includes perfunctory language about equal protection violations in each of her first six counts, the only legal *arguments* she makes in her Response are those delineated above.

16

to make out an Equal Protection claim must prove 'the existence of purposeful discrimination' motivating the state action which caused the complained-of injury.'" *McCleskey v. Kemp*, 481 U.S. 279, 292-293 (1987) (citation omitted); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-266 (1977). "Discriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group." *Johnson v. Rodriguez*, 110 F.3d 299, 306-07 (5th Cir. 1997).

Plaintiff cannot state a valid Equal Protection claim against the Defendants. The charges she levels in her Second Amended Complaint are, in the first place, injuries sustained by the Camp, and, as noted above, Plaintiff cannot sue to recover for injuries to the Camp. Second, even if Plaintiff is referring to the revocation of *her* license – an argument she does not make in the Equal Protection clause context – this was action taken by TDPFS, not the Defendants.[13] The complained of "state actions" were made by the officials other than the Defendants here, *see McCleskey*, 481 U.S. at 292-93. For these reasons, it is recommended that the Comptroller Defendants' summary judgment motion on Plaintiff's Equal protection clause claim be granted.

**F.     First Amendment Retaliation Claim**[14]

Defendants' contend that Plaintiff's First Amendment retaliation claims fails. They put forth a number of different arguments. However, the central point here is this: The Fifth Circuit has set

---

[13] Although it is not entirely clear from her Response, it appears that Plaintiff, when she complains that the children at the Camp were removed without the option of "risk evaluation" (a process that was offered to others accused of abuse) is arguing about an equal protection violation personal to her. *See* Plaintiff's Response at 35-36. However, even if that is the case, the point remains that the "risk evaluation" was a TDFPS decision, not one made by the Comptrollers.

[14] Contrary to Defendants' assertion, in Count I of her Second Amended Complaint, Plaintiff pleads a First Amendment retaliation claim. *See* Complaint at 39.

forth the framework for determining when a public employee's speech rights have been violated. To prevail on a § 1983 First Amendment retaliation claim, a public employee must establish the following: (1) he suffered an adverse employment action; (2) his speech involved a matter of public concern; (3) his interest in commenting on matters of public concern outweighs the employer's interest in promoting efficiency; and (4) his speech motivated the employer's adverse action. *Oscar Renda Contracting, Inc. v. City of Lubbock, Texas*, 463 F.3d 378, 382 (5th Cir. 2006). Plaintiff cannot bring a First Amendment retaliation claim because she was not a public employee, and, for that matter, was not an employee of Strayhorn's or the Comptroller's office. She is not, in other words, a member of the possible universe of plaintiffs that could bring a First Amendment retaliation claim.[15] Therefore, it is recommended that this claim be dismissed.

**G.     State Law Claims**

Plaintiff, in her Second Amended Complaint, agreed to drop all her pending state law claims against the Comptroller Defendants. Therefore, the Court will recommend that Defendants' Motion to Dismiss be granted as to the state law claims.

### III.  RECOMMENDATIONS

Based on the above, the Magistrate Court **RECOMMENDS** that the District Court **GRANT** Defendants' Rule 12(b)(6) Motion to Dismiss *(*Clerk's Doc. No. 22) and dismiss all of the claims

---

[15] For example, one of Defendants' arguments here is that because Plaintiff's license was restored after the administrative hearing, and because she has no protected interest in her employment, she cannot uphold her burden because the Fifth Circuit has construed *Paul v. Davis*, 424 U.S. 693 (1976), to require "a section 1983 plaintiff to show stigma plus an infringement of some other interest." *Blackburn v. City of Marshall*, 42 F.3d 925, 935-36 (5th Cir . 1995). In other words, Defendants contend Plaintiff cannot show the "plus" because all of her other claims fail. This argument, however, puts the cart before the horse. The Fifth Circuit, in *Breax v. City of Garland*, noted that "Stigma, by itself, without an impact on one's employment, does not constitute an adverse *employment action*." 205 F.3d 150, 158 n. 14 (5th Cir. 2000) (citing *Blackburn*, 42 F.3d at 935-36) (emphasis added).

against Carole Strayhorn, Vicki Anderson, and Ruthie Ford for failure to state a claim on which relief may be granted.

### IV.  WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 21st day of February 2007.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE